IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILES D. THOMAS, | : | 1:09-cv-1557 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v | : | |
| | : | |
| WILLIAM SANDSTROM, AMY | : | |
| KAUNAS, KEN HUGENDUBLER, | : | |
| THE HARRISBURG AREA HUMANE | : | |
| SOCIETY, and JOHN DOE, | : | Hon. John E. Jones III |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### July 21, 2010

This matter is before the Court on the report and recommendation ("R&R") of Magistrate Judge Martin C. Carlson, which recommends that we deny the Plaintiff Miles D. Thomas' Motion to Reinstate the above-captioned litigation, (Doc. 46). (Doc. 54). While Plaintiff Miles Thomas ("Plaintiff" or "Mr. Thomas") has lodged objections to the R&R, (Doc. 55), Defendants William Sandstrom ("Sandstrom"). Amy Kaunas ("Kaunas"), Ken Hugendubler ("Hugendubler"), the Harrisburg Area Humane Society ("HAHS"), and Officer John Doe ("Officer Doe") have not. Further, while the above-named Defendants have not filed a response to Plaintiff's objections to the R&R, the time in which to do so has long

1

since expired. Accordingly, the R&R is ripe for disposition. For the reasons set forth below, the Court will adopt the Magistrate Judge's R&R and overrule the Plaintiff's objections.

## I. STANDARD OF REVIEW

When objections are filed to the report of a magistrate judge, the district court makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objections are made. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667, 674-75 (1980). The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.* Although the standard of review is *de novo*, 28 U.S.C. § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 674-75; *see also Matthews v. Weber*, 423 U.S. 261, 275 (1976); *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984).

## II. STATEMENT OF FACTS

In the summer of 2009, Plaintiff's dog was confiscated from his car by Thomas Sandstrom, a Humane Society Police Officer employed by HAHS, for

apparent violations of state animal cruelty laws.[1] Thereafter, Plaintiff was allegedly coerced into signing a release of ownership in exchange for assurances that criminal charges would not be filed against him. (Compl. ¶ 26). After purportedly making numerous unsuccessful attempts to have the waiver rescinded, Plaintiff initiated the above-captioned action and sought a temporary restraining order from this Court. After resolving the motion for a temporary restraining order, we made numerous, painstaking attempts to aid the parties in settling the case, which ultimately proved unsuccessful. Eventually, we referred the case to Magistrate Judge Martin C. Carlson for mediation. In February of 2010, it appeared as though Magistrate Carlson had managed to cut the proverbial Gordian

---

[1] Officer Doe of the Middletown Police Department apparently walked passed Plaintiff's car while it was parked along a thoroughfare in Middletown, Pennsylvania. Upon viewing the allegedly inhumane conditions in which the dog was confined, he called the HAHS to notify it o the same. HAHS subsequently dispatched Sandstrom to the scene. Upon arrival, Sandstrom could detect a strong odor of feces and urine emanating from the car. The back seat had substantial amounts of feces throughout, including on the seats and the seat backs. The dog had feces matted in his fur and feet. Accordingly, Sandstrom confiscated the dog pursuant to relevant state animal cruelty laws. *See* 18 Pa.C.S. § 5511(c) ("A person commits an offense if he wantonly or cruelly treats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care . . . or deprives any animal of necessary sustenance, drink, shelter or veterinary care, or access to clean and sanitary shelter . . . ."); 18 Pa.C.S.A. § 5511(e) ("A person commits a summary offense if he carries, or causes, or allows to be carried in or upon any cart, or other vehicle whatsoever, any animal in a cruel or inhumane manner. The person taking him into custody may take charge of the animal and of any such vehicle and its contents . . . ."); 22 Pa.C.S. § 3708(a) (Pennsylvania law empowers an individual appointed as a Humane Society Police Officer to enforce Pennsylvania animal cruelty laws).

Knot and shepherded the parties towards an amicable settlement.[2] Accordingly, on February 22, 2010, we entered an Order dismissing the case "without costs and without prejudice to the right of either party, upon good cause shown, to reinstate the action within sixty (60) days if the settlement is not consummated." (Doc. 45).

On March 19, 2010, Plaintiff filed a Motion to Reinstate. (Doc. 46). We thereafter referred this matter back to the able hands of Magistrate Judge Carlson since he was intimately familiar with the process that led to the settlement. (Doc. 47). On May 7, 2010, Magistrate Judge Carlson filed the aforementioned R&R, which denied Plaintiff's Motion to Reinstate. Plaintiff filed timely objections to the R&R, leaving the issue in its present posture.

## III. DISCUSSION

Plaintiff bases his objections to the aforementioned R&R on the following grounds. First, he notes that upon receiving indication from Magistrate Judge

---

[2] The settlement states, in part:

> For Sole Consideration of the return of the dog, Baron, to Miles Thomas, under the terms of the Foster Car Agreement . . . Thomas hereby releases and forever discharges William Sandstrom, Amy Kaunas, Ken Hugendubler, the Harrisburg Area Humane Society, and the Cincinnati Insurance Company, their heirs, executors, administrators, agents, and assigns, and all other persons, firms, and corporations . . . from any and all claims, demands, damages, actions, causes of action, rights, costs, loss of services, expenses, compensation or suits of any kind or nature whatsoever, which [Thomas] now has . . . or which may hereafter accrue on account of or in any way growing out of . . . the alleged seizure of . . . Baron . . . .

(Doc. 49-2).

4

Carlson that the above-captioned case had been amicably settled, we entered an order on February 22, 2010 in which we dismissed the action "without costs and without prejudice to the right of either party, upon good cause shown, to reinstate the action within sixty (60) days if the settlement is not consummate." (Doc. 45). Accordingly, Plaintiff argues that he should be permitted to reinstate the action because his motion was lodged within the aforementioned 60-day time frame. Second, Plaintiff states that he made clear to Magistrate Judge Carlson from the outset of settlement negotiations that any potential release would not be truly voluntary. Consequently, he concludes that the release is unenforceable as a result of duress.[3] Third, Plaintiff claims that the release is void because it would permit Defendants to violate relevant Pennsylvania law prohibiting entities from entering into contracts that are explicitly against the law or violate public policy. Plaintiff also avers that Magistrate Judge Carlson's recommendations would place Defendants in contempt of two "binding legal contracts that pre-date and preempt

---

[3] Plaintiff maintains this position despite the fact that Defendants returned his dog to him under the terms of the release, believing that that document was in fact binding on all parties. He states, "The fact that the defendants went on to do what they should have done before the suit was filed [*i.e.*, return his dog] did not give plaintiff any benefit that he wasn't already entitled to . . . ." (Doc. 55, p. 2). Indeed, Plaintiff goes on to state that he "had no duty to not accept the return of the property wrongfully taken from him simply because he received competent legal counsel that simply [and] completely outmaneuvered the defendants through perfectly appropriate means and exploited the collective incompetence of the well-resourced defendants and their counsel . . . ." (*Id.*, p. 6).

Judge Carlson's agreement. One filed with the PA State Attorney General's Office and the other in Judge Christopher Connor's [sic] Court . . . ." (Doc. 55, p. 5). Fourth, Plaintiff maintains that Officer Doe was never a party to the release, meaning that, in the very least, he should be permitted to reinstate his claims against Officer Doe.[4] We address the arguments *seriatim*.

By the plain language of the settlement order we entered on February 22, 2010, the parties were not, as Plaintiff implies, given a *right* to re-institute the above-captioned case; rather, they were *permitted* to do so only upon good cause shown. (*See* Doc. 45). A release that is not obtained by fraud, duress, or mutual mistake is binding between the parties. *See Black v. Jamison*, 913 A.2d 313, 318 (Pa. Commw. Ct. 2006). Accordingly, in our view "good cause" can only be established, and Plaintiff's lawsuit can only be re-instated, if Plaintiff can prove that his signature was obtained through fraud, duress, or mutual mistake.

To this end, Plaintiff claims to have been under duress when he signed the release. To wit, he alleges that he was "coerced" into signing the release by the

---

[4] Plaintiff asserts that Officer Doe and his attorney never even participated in settlement negotiations, meaning that the release cannot possibly be construed to apply to him. He claims that if his lawsuit is not reinstated on this basis, it would violate his "rights to access the courts, and would draw both an emergency extraordinary writ and emergency complaint to the judicial board for refusing to process a federal civil rights claim that has been properly filed . . . ." (Doc. 55, p. 4).

6

"bond of love" he shared with Baron. (Doc. 54-2) (January 28, 2010 e-mail from Plaintiff's counsel). However, [u]nder Pennsylvania law, absent a threat of actual bodily harm, there can be no claim of duress where the contracting party is free to consult with counsel." *Cuchara v. Gai-Tronics Corp.*, 129 Fed. Appx. 728, 731 (3d Cir. 2005) (citations and internal quotations omitted). Since Plaintiff was represented by counsel throughout the pendency of the above-captioned litigation, and since Plaintiff has not alleged any threat of bodily harm, we believe that his claims of duress are insufficient to void the settlement agreement at issue in this case.[5] Accordingly, we shall deny Plaintiff's objections to the R&R to this extent.[6]

With regard to Plaintiff's third argument, he claims that the recommendation of Magistrate Judge Carlson would permit Defendants to violate both law/public policy and the terms of two legal contracts governing Defendants' conduct.

---

[5] Further, we are constrained to note that Plaintiff's claim that his signing of the release was involuntary appears to lack credulity. Indeed, at the outset of settlement negotiations, Magistrate Judge Carlson made the parties perfectly aware of the fact that participation in mediation was entirely voluntary. (Doc. 53, Ex. B). Further, when Plaintiff's counsel indicated that his client felt "compelled" to participate in mediation because of his urgent desire to regain possession of his dog, Magistrate Judge Carlson further stressed the voluntariness of the mediation process. (Doc. 54-2) (January 28, 2010 e-mail from Magistrate Judge to parties). Despite these notices, Plaintiff proceeded to participate in settlement negotiations. We believe that this belies Plaintiff's assertion that his participation in settlement discussions was involuntary.

[6] At this juncture, we can also reject any argument to the effect that the release was signed by mutual mistake, since there is no indication that a mistake was common to both Plaintiff and Defendants. *See* 8 PA. LAW. ENCYCLOPEDIA § 84 ("A mutual mistake is one common to both or all parties.").

Accordingly, he claims that Defendants' failure to notify Magistrate Judge Carlson of the same renders fraudulent their conduct in settlement negotiations and makes the release void. However, despite these claims, Plaintiff fails to provide us with, or direct us towards, the laws, policies, or agreements the nondisclosure of which renders Defendants' conduct fraudulent. Indeed, Plaintiff has failed in the most simplest of tasks: to specifically identify by name or citation the laws, policies, or contracts to which it refers. Plaintiff's astonishing failure in this regard leaves us unable to assess the validity of his claim. Accordingly, we shall deny Plaintiff's objections to this extent. *See Young v. Robertshaw Controls Co.*, 430 F.Supp. 1265 (E.D. Pa. 1977) (The burden of proving the release is invalid is on the party alleging its invalidity.).

Finally, we address Plaintiff's assertion that his claims against Officer Doe must be reinstated because Officer Doe was not a party to the release. In this regard we note that the law pertaining to releases is well settled: "[i]t is axiomatic that releases are construed in accordance with traditional principles of contract law, fundamental to which is the directive that the effect of a release must be determined from the ordinary meaning of its language. " *Maloney v. Valley Med. Facilities, Inc.*, 946 A.2d 702, 706 (Pa. Super. Ct. 2008) (citations and internal quotations omitted). "When contractual language is clear and unequivocal, its meaning must

be determined by its contents alone. The language of a contract is unambiguous if a court is able to determine its meaning without any guide other than knowledge of the basic facts on which the contract's meaning depends." *Leskanic v. General Motors Corp.*, 2008 WL 2175560 * 1 (Pa. Ct. Common Pl. 2008) (citing *Black*, 913 A.2d at 318) (internal quotations omitted). The release at issue in this case states, in relevant part:

> For Sole Consideration of the return of the dog, Baron, to Miles Thomas, under the terms of the Foster Car Agreement . . . Thomas hereby releases and forever discharges William Sandstrom, Amy Kaunas, Ken Hugendubler, the Harrisburg Area Humane Society, and the Cincinnati Insurance Company, their heirs, executors, administrators, agents, and assigns, *and all other persons*, firms, and corporations . . . from any and all claims, demands, damages, actions, causes of action, rights, costs, loss of services, expenses, compensation or suits of any kind or nature whatsoever, which [Thomas] now has . . . or which may hereafter accrue on account of or in any way growing out of . . . the alleged seizure of . . . Baron . . . .
> 
> \*     \*     \*     \*
> 
> Upon completion and execution of the Foster Care Agreement, and placement of the dog under the terms of the Foster Care Agreement with the Plaintiff, [Plaintiff] agrees to settle and discontinue the litigation filed in the United States District Court for the Middle District of Pennsylvania at docket number 1:CV 09-1557 and withdraw with prejudice the appeal filed at 09-4714 in the United States Court of Appeals for the Third Circuit.

(Doc. 49-2) (emphasis added). As is apparent, the documents explicitly releases from liability *all persons* from any and all claims accruing from the alleged seizure

9

of Baron. We believe that this language is clear, direct, and unambiguous and indicates that the terms of the release are to apply to *all* of Plaintiff's claims arising from the seizure of his dog, including those asserted against Officer Doe. Post-settlement writings appear to indicate the accuracy of this interpretation.[7] The fact that Officer Doe was not present during negotiations is of no import. *See Hanselman v. Consolidated Rail Corp.*, 632 A.2d 607 (Pa. Commonw. Ct. 1993).[8]

---

[7] On January 14, 2010, one day after Plaintiff signed the release, Magistrate Judge Carlson e-mailed the parties to summarize the terms thereof. The Magistrate Judge made clear his expectation that once Plaintiff received his dog he would "voluntarily discontinue *all* litigation . . . ." (Doc. 54-2) (January 14, 2010 e-mail from Magistrate Judge Carlson) (emphasis added). Defendants echoed this interpretation in a February 19, 2010 e-mail to Plaintiff's counsel. (*See* Doc. 49-5) (February 19, 2010 e-mail from Defendants' counsel) (" . . . Baron has now been delivered to his new residence with Mr. Thomas . . . . Please also settle and discontinue the litigation in the Middle District and withdraw with prejudice the appeal filed in the Third Circuit as outlined in the Release."). An e-mail sent by Plaintiff's counsel seemed to reaffirm the Magistrate Judge's interpretation. (*See* Doc. 54-2) (January 28, 2010 e-mail from Plaintiff's counsel) ("We *either* want the dog returned *or* the litigation reinstated . . . . I suppose another motion to reinstate the active litigation of this case will be necessary . . . *if* we are not able to resolve this matter . . . .") (emphasis added). Based upon these communications, which are not parol evidence and may therefore be used to elucidate the meaning of the terms of the release, *LeDonne v. Kessler*, 389 A.2d 1123, 1126 (Pa. 1978), we believe that our interpretation of the plain language of the release is correct.

[8] *Hanselman* involved an vehicular accident where a car in which the plaintiff was a passenger collided with a train. The plaintiff signed a release discharging the driver, the owners of the car, their insurance company, "any and all other persons, firms, corporations, associations of and from any and all causes of action, suits, rights, judgments, claims and demands of whatsoever kind . . . arising out of the accident . . . ." *Hanselman*, 632 A.2d at 609. Plaintiff later attempted to sue the train company. On appeal, the Commonwealth Court held that the releases were general releases that discharged *all* potential tortfeasors from liability arising from the accident. *See generally id.* In doing so, the *Hanselman* Court noted, "There is no requirement that all of the parties to be discharged from liability are specifically named within a release if the terms of the release clearly extend to other parties." *Hanselman v. Consolidated Rail Corp.*, 632 A.2d 607, 609 (Pa. Commonw. Ct. 1993) (citing *Estate of Bodnar*, 372 A.2d 746 (Pa. 1977)). The Commonwealth Court further stated, "The Pennsylvania Supreme Court has held that when

Accordingly, it is our determination that the release signed by Plaintiff prevents him from re-instituting his claims against all Defendants, including Officer Doe. We shall overrule Plaintiff's objections to this extent.

## IV. CONCLUSION

In light of the foregoing discussion, we shall adopt the Magistrate Judge's R&R and overrule Plaintiff's objections in their entirety.[9] We would be remiss in failing to note that this attempt to reinstate is grounded in utter nonsense. Candidly, we believe it to be primarily the product of Plaintiff's counsel, who progressively became more enthralled with this unfortunate case, than Plaintiff himself. An appropriate Order that terminates the endless folly that this case has become will follow.

---

the terms of a release discharge all claims and parties, the release is applicable to all tort-feasors despite the fact that they were not specifically named and did not contribute toward the settlement." *Id.* (citing *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733 (1989)).

Like the release signed in *Hanselman*, the release signed by Plaintiff in the case at bar clearly and unequivocally establishes that he agreed to release his claims not only against the entities specifically named in the release, but also against anyone and everyone who was or could be sued based upon the incident involving the seizure of his dog. Consequently, we conclude that the release signed by Plaintiff in the case *sub judice* was a general release discharging *all* parties, including Officer Doe, from liability in this case. *See id.* at 608-09.

[9] Plaintiff's arguments regarding the allegedly unlawful conditions at the HAHS are irrelevant to our resolution of the instant Motion and so we have elected to forego in-depth discussion of the same. To the extent that Plaintiff argues that his attorney advised him that there was no way that the release could resolve all claims in this case, (Doc. 51, ¶ 2), we regret to inform him that he simply received bad advice.